# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

AARON JEROME JACOBS,     )
                                      )
          Petitioner,         )
                                      )
v.                            )          **No. CIV 15-025-RAW-KEW**
                                      )
JOE W. ALLBAUGH, Warden,     )
                                      )
          Respondent.      )

## OPINION AND ORDER

This matter is before the Court on Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is a pro se prisoner currently incarcerated at Davis Correctional Facility in Holdenville, Oklahoma. He is challenging his conviction in Pushmataha County District Court Case No. CF-2010-25 for First Degree Felony Murder During the Commission of a Robbery with a Dangerous Weapon, or in the alternative, First Degree Malice Aforethought Murder. He sets forth the following grounds for relief:

> I.    The evidence was insufficient to convict Petitioner of First Degree Murder beyond a reasonable doubt.
>
> II.   The prosecutor impermissibly used prior statements made by State's witness Chris Dill as substantive evidence of guilt.
>
> III.  Petitioner was denied effective assistance of trial counsel.
>
> IV.  The accumulation of errors deprived Petitioner of a fair trial.

Respondent concedes that Petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review. The following records have been submitted to the

Court for consideration in this matter:

     A.     Petitioner's direct appeal brief.

     B.     The State's brief in Petitioner's direct appeal.

     C.     Summary Opinion affirming Petitioner's Judgment and Sentence.

     D.     Transcripts

     E.     State court record.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Facts**

Sometime between midnight and 6:00 a.m. on April 5, 2010, Petitioner beat, shot, and killed Robert Edward Strickland and dumped his body alongside a rural mountain road in Pushmataha County. (Tr. II, 286, 289, 293-98; Tr. III, 503-505; State's Exs. 54-62, 91, 97). After dumping Mr. Strickland's body, Petitioner drove Mr. Strickland's vehicle to another location and set it on fire. (Tr. II, 396-403; Tr. III, 526-29; State's Exs. 1-12, 97).

Before Mr. Strickland was killed, he was lured to a rural road where he thought he was meeting Petitioner's friend, Karrie McKeever. (Tr. II, 274-76; 382-83). Mr. Strickland and Ms. McKeever were acquaintances, and Mr. Strickland had sold drugs to Ms. McKeever on past occasions. (Tr. II, 278, 288, 318, 383). On that night, Ms. McKeever had sent several text messages to Mr. Strickland, claiming she was stranded with a friend and needed help repairing her vehicle. (Tr. II, 275-76, 379-83). In reality, Petitioner, Ms. McKeever, Natasha Cathey, and Clifton Parish, who had been driving around together that night in Petitioner's truck, intended to rob Mr. Strickland of his drugs and money. (Tr. II, 272-76, 279).

When Mr. Strickland first arrived at the location referred to as the Messer area clearing, he saw Ms. McKeever and Ms. Cathey arrive in Petitioner's truck. (Tr. II, 276-78). Ms. McKeever and Ms. Cathey had dropped off Petitioner and Mr. Parrish several yards back, so they could hide in the woods and not be seen by Mr. Strickland. (Tr. II, 276-77). Once at the Messer area clearing, Ms. McKeever and Ms. Cathey got into Mr. Strickland's SUV and smoked some methamphetamine that Mr. Strickland had brought with him. (Tr. II, 277-79). While smoking, Ms. Cathey observed Mr. Strickland's black handgun in the passenger seat. (Tr. II, 279, 350, 384-85; State's Ex. 69). Mr. Strickland never picked up the weapon while they were in the vehicle. (Tr. II, 279). After several minutes Ms. Cathey and Ms. McKeever exited Mr. Strickland's vehicle and walked back to Petitioner's truck. (Tr. II, 279-81).

When Mr. Strickland drove off, Petitioner and Mr. Parish walked out of the woods and back to the truck. (Tr. II, 280-82). After some discussion between the four, Ms. McKeever called Mr. Strickland on her cell phone and asked him to come back to the clearing so they could look for Ms. Cathey's car keys. (Tr. II, 282). This time, when Mr. Strickland came to the clearing, Petitioner stood next to his truck, and Mr. Parish hid in the woods. (Tr. II, 282-83). When Mr. Strickland stopped his SUV, Ms. McKeever opened the passenger door on the ruse of looking for Ms. Cathey's car keys. (Tr. II, 283-84). Instead, she grabbed Mr. Strickland's .22 caliber gun from the seat. (Tr. II, 284, 347-48, 350). When Mr. Strickland asked what was going on and exited his vehicle, Petitioner grabbed Mr. Strickland from behind and wrapped his arms around his body. (Tr. II, 284-86, 288, 315). Mr. Parish came out of the woods and proceeded to beat Mr. Strickland on his face and head with his fists and the gun, while Petitioner kept Mr. Strickland restrained. (Tr. II, 284-88, 350). After the two beat Mr. Strickland until he was lying on the ground bleeding extensively from his head, Mr. Parish dragged Mr. Strickland to a mud hold where he washed the blood off Mr. Strickland's face and told him to stay away from Ms. McKeever. (Tr. II, 286-88, 350). Petitioner and Mr. Parish then loaded Mr. Strickland in the cargo area of his SUV. (Tr. II, 289).

Ms. Cathey and Petitioner left the Messer area clearing in Mr. Strickland's SUV, while Mr. Parish and Ms. McKeever left the clearing in Petitioner's truck. (Tr. II, 289-90). Upon orders from Petitioner, Ms. Cathey drove to an isolated area known as Frazier Creek

and stopped the SUV. (Tr. II, 289-94). When the vehicle stopped, Mr. Strickland, even in his injured state, somehow was able to escape the cargo area and attempt to run away. (Tr. II, 294). Petitioner jumped out of the vehicle and chased after Mr. Strickland. (Tr. II, 293-94). Ms. Cathey, who had remained in the vehicle, heard someone yell "no" and then heard a gunshot. (Tr. II, 294-96). After the shot, Petitioner returned, uninjured, to the vehicle and backed it up to where Mr. Strickland was lying prone on the ground near the ditch. (Tr. II, 296-97). Ms. Cathey watched as Petitioner got out, picked up a large rock, and threw it down toward Mr. Strickland's head. (Tr. II, 297-98, 332). Petitioner then loaded Mr. Strickland back into the cargo area of the vehicle. (Tr. II, 298-99). At that point Ms. Cathey did not know if Mr. Strickland was still alive. (Tr. II, 301-02). She heard a "weird noise" coming from Mr. Strickland that did not sound like normal breathing, but rather like air coming from his body. (Tr. II, 301-02).

After leaving the scene, Petitioner drove the victim's SUV to his parents' house with Ms. Cathey and the victim. (Tr. II, 299-01, 339). He parked the SUV and ran inside the house to change his bloody clothing. (Tr. II, 301-02). Petitioner then told Ms. Cathey he was taking the victim to the hospital and left Ms. Cathey with Mr. Parish and Ms. McKeever, who had arrived at the house in Petitioner's truck. (Tr. II, 302-03, 334). Once Petitioner left, Ms. Cathey, Mr. Parish, and Ms. McKeever took the money they had stolen from the victim to buy gas and minutes for a cell phone, to gamble at a casino, and to get a tattoo. (Tr. II, 303-08). Mr. Parish also kept part of the victim's drugs for himself. (Tr. II 307-08).

Petitioner did not take the victim to the hospital. (Tr. IV, 670). Instead, he drove down a two-lane dirt road to a pine plantation and dumped the victim's body. (Tr. III, 538-45; Tr. IV, 643, 667-72; State's Exs. 54-62, 92-94). He next drove approximately three miles to another dirt road where he parked the vehicle and set it on fire. (Tr. III, 527-30; Tr. IV, 667-72; State's Exs. 1-12, 92-94). He then went to a remote cabin a few miles away, where he stopped for a period of time, signed the guest register, and took the homeowner's shoes when he left. (Tr. III, 515-16, 519, 521, 523; State's Exs. 84-86, 92-94).

Petitioner next arrived at the home of his friend John Wesley Taylor in Rattan, Oklahoma. (Tr. IV 593-95). He woke up Mr. Taylor and told him he had been hunting and needed to wash some blood off his hands. (Tr. IV, 595-99). The next day Petitioner and Ms. Cathey returned to Mr. Taylor's house to "unload some junk" from the back of Petitioner's truck. (Tr. IV, 599-600). After unloading the items, the three stopped at a church where Petitioner and Mr. Taylor smoked methamphetamine. (Tr. IV, 600-01). Petitioner told Mr. Taylor he had obtained the methamphetamine when he beat up "the dope man" and took his drugs. (Tr. IV, 601-02). Petitioner had stolen so much dope from "the dope man" that he gave some to Mr. Taylor. (Tr. IV, 601-02).

The victim's burned-out SUV was discovered and reported to the police around 6:00 a.m. on April 5, 2010. (Tr. II, 396-98; 403; State's Exs. 1-12). The victim's girlfriend reported him missing to police on April 6, 2010. (Tr. II, 388; Tr. III, 432-33). After the missing person's report and the burned-out vehicle were connected, law enforcement

officials discovered the Messer area scene where the victim had been beaten. (Tr. II, 398-403; State's Ex. 95). Passers-by later discovered blood, gun parts, and bullets at the Frazier Creek scene and reported their findings to police. (Tr. III, 416-423).

On April 8, 2010, Petitioner was taken into custody and interviewed by agents with the Oklahoma State Bureau of Investigation ("OSBI"). (Tr. IV, 676, 710-15; State's Ex. 97). After numerous denials and stories about what had happened to the victim, Petitioner admitted his involvement. (Tr. IV, 686-87, 710-15; State's Ex. 97). He claimed, however, that he and the victim got into a "scuffle," and the victim shot himself when the gun went off during the fight. (State's Ex. 97). He also told the agents he was trying to take the victim to the hospital when he realized the victim was dead. *Id.* During the interview he refused to tell the agents what he had done with the victim's body. *Id.*

The victim's body was discovered by a search party in the pine plantation on April 12, 2010. (Tr. III, 501-05, 510; State's Exs. 89, 95). The body was in an advanced state of decomposition. (Tr. III, 504; Tr. IV, 730, 730; State's Ex. 91).

At the Messer area scene where the victim was initially beaten, investigators discovered a large pool of blood on the ground, as well as bloody leaves. (Tr. III, 436, 446; Tr. IV, 646-49; State's Exs. 13-26, 71). Police collected a portion of the leaves as well as a cigarette butt and some chewing gum found at the scene. (Tr. III, 446, 452; State's Exs. 13-26, 70, 72). DNA analysis conducted on the bloody leaves and the chewing gum resulted in a match to the victim's DNA profile. (Tr. V, 808-10; State's Ex. 127). DNA analysis of

the cigarette butt resulted in a match to Petitioner's DNA profile. (Tr. V, 808-10; State's Ex. 127).

At the Frazier Creek scene where the victim was beaten and shot, investigators found more blood on the ground, blood spatter on rocks, a spent .22 caliber bullet casing in the ditch near the blood, two live .22 caliber rounds, and a bone fragment. (Tr. III, 452, 454-58; Tr. 1V, 646-49; State's Ex. 27-45, 73-80). The bone fragment later was analyzed by anthropologist Angela Berg and determined to be a human cranial fragment which most likely was expelled from the victim's body as a result of being struck by a projectile. (Tr. V, 774-75, State's Ex. 45).

An autopsy was performed on the victim by Dr. Joshua Lanter at the Oklahoma Medical Examiner's Office. (Tr. IV, 729). Several "gaping" defects or lacerations on the victim's scalp were observed by the medical examiner. (Tr. IV, 730-32; State's Exs. 63-67). The lacerations corresponded with numerous depressed fractures to the victim's skull. (Tr. IV, 732-33; Tr. V, 782-84; State's Exs. 63-67, 100, 102, 104-19).

Because of the body's advanced state of decomposition, Ms. Berg, an employee of the Medical Examiner's Office, reconstructed the victim's skull to properly document the injuries. (Tr. IV, 733-34; Tr. V, 763, 765-67). After reconstruction, if was apparent the victim had holes punched out of his skull, resulting in lethal injuries. (Tr. IV, 735-38; State's Exs. 100, 102, 104-19, 123). Numerous parts of the skull, including the area around the victim's nose and eyes, were missing or so damaged they could not be reconstructed. (Tr.

V, 767-80; State's Exs. 104, 109-12). Several parts of the skull had been "bruised" as a result of the hard blows to the head. (Tr. V, 780, 783; State's Exs. 100, 104, 109). Four of the approximately ten skull injuries observed by Ms. Berg after reconstruction were "signature" fractures which corresponded with the size, shape, and depth of different areas of the gun used to beat the victim. (Tr. V, 768, 785-95; State's Exs. 100-05, 118-23). In particular, the victim had identifiable fractures to his head caused by the bolt, muzzle, and grip of the weapon. (Tr. V, 789-96; State's Exs. 100-05, 118-23). The remaining fractures were deemed non-signature fractures. (Tr. V, 796). An examination of the numerous parts of the skull which were missing revealed no identifiable bullet holes. (Tr. IV, 747-48; Tr. V, 800). Ms. Berg explained that a blow to the head by a blunt object such as a gun generally does not cause bone to be expelled from the body like the fragment found at the Frazier Creek scene. (Tr. V, 798-99). After reconstruction and examination, Dr. Lanter determined the victim's cause of death was blunt force trauma as a result of the accumulation of blows inflicted on the victim's head. (Tr. IV, 738-39, 741-43).

After the body was discovered and Petitioner was arrested, he told his friend Adam Courtwright, who was in jail at the same time as Petitioner and who had been extremely close to the victim, that Petitioner and Mr. Parish got into a scuffle with the victim after he pulled a gun on them at the Messer clearing. (Tr. IV, 619-20, 626-27). Petitioner also told Mr. Courtwright that after he subdued the victim, they both got into the SUV and Petitioner drove toward Frazier Creek where he stopped the vehicle. (Tr. IV, 627-28, 630). Petitioner

claimed he had bullied the victim and messed with his head along the way, and when they stopped, they got into a fight. (Tr. IV, 630-31). In addition, Petitioner told Mr. Courtwright that the victim tried to shoot him in the head but missed. (Tr. IV, 631). Petitioner stated he next beat the victim with a flashlight until he was unconscious. (Tr. IV, 631-32). He then loaded the victim into the back of the SUV and drove to his house, where he told the other three he was taking the victim to the hospital. (Tr. IV, 632). He told Mr. Courtwright that after that point, he blacked out. (Tr. IV, 632).

**Ground I: Sufficiency of the Evidence**

Petitioner alleges in Ground I of the petition that the evidence was insufficient to sustain his conviction for murder. Petitioner raised this claim on direct appeal, and the Oklahoma Court of Criminal Appeals ("OCCA") denied relief in its Summary Opinion:

> After reviewing the evidence in the light most favorable to the State, we find that any rational trier of fact would find beyond a reasonable doubt that Jacobs committed either First Degree Felony Murder or First Degree Malice Aforethought Murder based on the evidence presented in this case. *See Logsdon v. State*, 231 P.3d 1156, 1161 (Okla. Crim. App. 2010); *Spuehler v. State*, 709 P.2d 202, 203-04 (Okla. Crim. App. 1985).

*Jacobs v. State*, No. F-2012-141, slip op. at 2 (Okla. Crim. App. Feb. 12, 2014) (Dkt. 7-3). Respondent asserts the OCCA's determination of this claim was not contrary to, or an unreasonable application of, Supreme Court law.

> Sufficiency of the evidence is a mixed question of law and fact. We ask whether the facts are correct and whether the law was properly applied to the facts, which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas.

*Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006) (citations omitted), *cert. denied*, 549 U.S. 1285 (2007).

In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319).

"[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record-- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)), *cert. denied*, 498 U.S. 904 (1990).

"[W]here a sufficiency challenge was resolved on the merits by the state courts, . . .

AEDPA adds an additional degree of deference, and the question becomes whether the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007) (citations and internal quotation marks omitted), *cert. denied*, 553 U.S. 1079 (2008). This standard is called "deference squared." *Hooks v. Workman*, 689 F.3d 1148, 1166 (10th Cir. 2012) (quoting *Young v. Sirmons*, 486 F.3d 655, 666 n.3 (10th Cir. 2007)).

"Even if a state court resolves a claim in a summary fashion with little or no reasoning, [the habeas court] owe[s] deference to the state court's result." *Paine v. Massie*, 339 F.3d 1194, 1198 (10th Cir. 2003). A state court's summary disposition must be upheld unless a federal habeas court is persuaded, after conducting an independent review of the record and pertinent federal law, that the state court's result "unreasonably applies clearly established federal law." *Id.* (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

To determine whether there was sufficient evidence presented at trial to sustain Petitioner's conviction, the Court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). With respect to the crime of First Degree Murder, the prosecution was required to prove the victim died either as a result of an act or event which happened while Petitioner was using a dangerous weapon to rob the victim, or that Petitioner acted with deliberate intent to take the life of the victim without justification. Okla. Stat. tit. 21, §§ 701.7(A&B); Okla. Stat. tit. 21, § 801; Instruction Nos. 4-61, 4-62, 4-

64, 4-144, OUJI-CR 2d. *See Black v. State*, 21 P.3d 1047, 1062 (Okla. Crim. App. 2007) ("To prove the mental state malice aforethought, the State must show the defendant acted with a deliberate intention to take the life of another without justification."). Under Oklahoma law, the deliberate intent sufficient to constitute murder may be formed in an instant before the homicidal act is committed. *Jones v. State*, 134 P.3d 150, 154 (Okla. Crim. App. 2006).

Petitioner argued on direct appeal that the State failed to prove he committed First Degree Murder by killing the victim during a robbery or with malice aforethought. He, therefore, asserted that the two theories were logically incompatible with each other. (Dkt. 7-1 at 9-15).

Regarding the theory of felony murder, Petitioner argued to the OCCA that there was no plan to rob the victim, but if the victim was robbed, Mr. Parish did it. Petitioner further claimed the robbery at the Messer clearing had concluded before the victim died at Frazier Creek. Therefore, the felony-murder doctrine did not lie under Oklahoma law. *See Lampkin v. State*, 808 P.2d 694, 695 (Okla. Crim. App. 1991) (holding "there must be a nexus between the underlying felony and the death of the victim in order for the felony-murder doctrine to apply"). In support of that argument, Petitioner alleged that the victim probably was not beaten with the pistol at the Messer clearing, because the gun grip was found at the Frazier Creek scene, and the victim allegedly was coherent after the Messer beating. (Dkt. 7-1 at 10-13).

A review of the evidence presented at trial, however, shows that Petitioner had a discussion with Mr. Parish, Ms. Cathey, and Ms. McKeever about luring the victim to the Messer clearing and robbing him of his drugs and money. (Tr. II, 275-276, 312). The victim arrived at the clearing the first time while Petitioner and Mr. Parish hid in the woods. (Tr. II, 276-77). The two women sat in the victim's SUV with him, smoked methamphetamine, and noticed that the victim's gun was within reach. (Tr. II, 278-79). They allowed the victim to leave without incident. (Tr. II, 279-81). Petitioner and the other three then discussed the situation and called the victim back to the scene a short time later. (Tr. II, 280-82). When the victim arrived, his gun was quickly taken, and he was restrained. (Tr. II, 282-86). He then was so badly beaten with "something hard" at the Messer scene that a large pool of his blood was left on the ground. (Tr. II, 285-88; Trial Ex. 14). The intensity of the blows to his head would have altered his behavior and eventually resulted in unconsciousness or death. (Tr. IV, 737-38).

After the beating, Petitioner and Mr. Parish forced the victim to get into the cargo area of the SUV. (Tr. II, 288-89). Petitioner and Ms. Cathey then drove away from the scene with the victim to a more secluded area. (Tr. II, 289-93). When the vehicle stopped at Frazier Creek, the victim somehow was able to try to run away. (Tr. II, 293-94). Petitioner quickly caught up with him and continued beating him on the head with the pistol and finally fired a shot that caused part of the victim's skull to fly off his head into the dirt. (Tr. II, 294-96); Tr. V, 774-75, 798-99; Trial Ex. 45). Petitioner then slammed a rock down on the

victim's head. (Tr. II, 296-98). According to the medical examiner, the accumulation of blows to the victim's head caused his death. (Tr. IV, 738-39, 741-43).

Based on the evidence, the Court finds it was reasonable for the jury to conclude that Petitioner intended to beat up and rob the victim when he arrived at the Messer clearing. It also was reasonable for the jury to conclude that Petitioner participated in the robbery with a dangerous weapon when he restrained the victim and assisted Mr. Parish in beating the victim until he was bleeding badly from his face and head. Finally, it was reasonable for the jury to conclude that the robbery with a dangerous weapon continued to Frazier Creek, given that Petitioner admitted he had the victim's gun and he personally stole a large amount of the victim's drugs during the robbery. (Tr. IV, 601-02; Trial Ex. 97).

Regardless of Petitioner's intent at the beginning of the robbery, he ended up beating the victim so badly to take his drugs that the victim died. Therefore, the jury's finding of guilt on the theory of felony murder was not unreasonable under Oklahoma law and should not be disturbed. *See Lampkin*, 808 P.2d at 695; *Grubbs*, 982 F.2d at 1487 (noting that a reviewing court "accept[s] the jury's resolution of the evidence as long as it is within the bounds of reason.").

Regarding malice aforethought murder, Petitioner claimed on direct appeal that the evidence was insufficient to prove this theory, because he had no personal animosity toward the victim and intended to take the victim to the hospital. (Dkt. 7-1 at 13-15). The Court finds, however, that the evidence set forth above also reasonably supported a theory of malice

aforethought murder. The record reflects that the victim had holes punched from his skull as a result of Petitioner's actions. (Tr. IV, 731, 733-34, 746-37; Tr. V, 767; Trial Exs. 109-16). Petitioner may have said at some point that he was taking the victim to the hospital, but his actions in driving to an even more secluded area after the initial beating demonstrated that he never intended to obtain help for the victim. Instead, he wanted to make sure the victim died and that there was no evidence of the robbery.

Whether Petitioner formed the actual intent to kill when he left the Messer clearing to dispose of the evidence, or he formed his intent in the instant he inflicted further lethal injuries on the victim's head at Frazier Creek, is immaterial. The evidence clearly showed Petitioner intended under Oklahoma law to kill the victim. *See Jones*, 134 P.3d at 154. Consequently, the jury's finding of guilt on the theory of malice aforethought murder was not unreasonable. *See Grubbs*, 982 F.2d at 1487.

On direct appeal, Petitioner asserted the evidence more reasonably suggested he killed the victim during a fight which got out of control. (Dkt. 7-1 at 15). This theory, however, was based on Petitioner's constantly shifting narrative about what he claimed had occurred, and the explanation was not plausible based on the evidence. Other that Petitioner's self-serving stories, there is no evidence to support any conclusion other than a finding of first degree murder.[1] The Court, therefore finds the jury's decision was not unreasonable, and the OCCA's decision on this matter was consistent with *Jackson*. This ground for habeas corpus

---

[1] The jury also was instructed on the lesser-included offenses of first degree manslaughter and second-degree murder. (O.R. 415-23).

relief fails.

**Ground II: Impeachment Testimony and Prosecutorial Misconduct**

Petitioner alleges in Ground II of the petition that the prosecutor impermissibly used prior statements by State's witness OSBI Agent Chris Dill as substantive evidence of guilt. Respondent asserts this claim presents no basis for federal habeas corpus relief, and it must be denied.

The record shows the prosecutor called Chris Black to testify about a conversation he had with Petitioner a few days before the victim's death. (Tr. II, 360-63). In that conversation, Petitioner told Mr. Black that he was going to rob and "beat the shit out of somebody," and if it went badly they would need a place to hide the body. (Tr. II, 361-63; Tr. IV. 693-94). During an interview with Agent Dill and the prosecutor, Mr. Black told both of them about the conversation. (Tr. II, 361-63; Tr. IV, 693-94). When Mr. Black testified, however, he claimed he either did not made certain statements, or he did not remember telling Agent Dill and the prosecutor about what Petitioner had said. (Tr. II, 361-63). Instead, Mr. Black testified he remembered driving around with Petitioner and talking about "beating the shit out of somebody." (Tr. II, 361, 363).

To impeach Mr. Black's denial of memory or knowledge about the entirety of Petitioner's statements, the prosecutor asked Agent Dill about the conversation during his testimony. (Tr. IV, 691-93). Agent Dill confirmed that Mr. Black told him of Petitioner's stated plan to rob and beat someone. (Tr. IV, 693-94). The prosecutor also was allowed to

introduce, over defense counsel's objection, a recorded telephone conversation between Mr. Black and Petitioner that Agent Dill had obtained. (Tr. IV, 705-10). The recording demonstrated the closeness of their relationship and revealed Mr. Black's knowledge of the conversation. (Trial Ex. 97).[2] During the phone call, Mr. Black specifically told Petitioner that the authorities had asked him about their conversation, but Black said he had told the authorities nothing. (Tr. II, 366; Tr. Vol. IV, 710; Trial Ex. 97).

On direct appeal, Petitioner admitted that Mr. Black's testimony was properly subject to impeachment through the testimony of Agent Dill and the admission of the recording to demonstrate bias. He argued, however, that the recording did not demonstrate bias, because Mr. Black testified he did not remember anything. The recording shows that Mr. Black had some memory of the conversation, just not the most incriminating portions. The OCCA rejected this claim on direct appeal:

> The district court did not abuse its discretion in admitting as evidence of bias the recorded jailhouse telephone calls from Jacobs to Chris Black because it arguably showed that Black did not want to admit he had told authorities about Jacobs' incriminating statements because of their close relationship. *See Neloms v. State*, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170 (defining abuse of discretion). Nevertheless, even if admission of this evidence were error, it was harmless in light of the strong and properly admitted evidence in this case. *See id.*, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 169 ("In the case of evidentiary error, the proper inquiry to determine if relief is required is whether this Court has 'grave doubts' that the outcome of the trial would have been materially affected had the error not occurred.").

> Nor do we find merit in Jacobs' claim that remarks made by the prosecutor

---

[2] Petitioner made the call to Mr. Black from jail and was aware it was being recorded. (Tr. IV, 706-07; Trial Ex. 97).

during closing argument about the recorded telephone call and Black's inconsistent statements require relief. These remarks--not met with objection--did not affect Jacobs' substantial rights or the outcome of the trial because the remarks were in response to defense counsel's argument and the jury was properly instructed on the use of impeachment evidence. *See Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923 (plain error is error that counsel failed to preserve through a timely trial objection, but upon appellate review, is clear from the record, affected the defendant's substantial rights and the plain error will not be corrected unless it represents a miscarriage of justice). This claim is denied.

*Jacobs*, slip op. at 2-3. (Dkt. 7-3).

Under Oklahoma law, even if a witness asserts a lack of memory of the subject matter of his prior statement, such assertion does not automatically prevent impeachment as to that statement. *See Omalza v. State*, 911 P.2d 286, 302 (Okla. Crim. App. 1995) (finding that a witness cannot avoid introduction of inconsistent testimony by asserting a lack of memory of the facts to which the prior testimony related). Here, the telephone conversation impeached Mr. Black's testimony because it showed he did not want to admit he had told the authorities about all of Petitioner's incriminating statements because of their close relationship.

Petitioner also complained on direct appeal that the prosecutor improperly used the impeachment evidence as substantive evidence of guilt during closing argument. (Dkt. 7-1 at 17).

In a habeas corpus action, claims of prosecutorial misconduct are reviewed only for a violation of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice."

> *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). In order to be entitled to relief, [petitioner] must establish that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This determination may be made only after considering all of the surrounding circumstances, including the strength of the State's case. *See Darden*, 477 U.S. at 181-82.

*Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006).

Because Petitioner did not object to the prosecutor's comments at trial, the OCCA reviewed this claim for plain error. (Dkt. 7-3 at 3). *See Brumfield v. State*, 155 P.3d 826, 834 (Okla. Crim. App. 2007) (holding that failure to object to prosecutor's argument waived all but plain error). Under Oklahoma law, while prior inconsistent statements may be used for impeachment, they may not be used as substantive evidence of guilt, unless they were made under oath during a court proceeding. *Omalza*, 911 P.2d at 301. Statements made to police, even if sworn, do not fall within the exception. *Id.*

The record reflects that in closing argument, the prosecutor referenced Mr. Black's testimony that he heard Petitioner state a few days before the victim died that he was going to "beat the shit out of somebody" as substantive evidence of guilt. (Tr. II, 361, 363). Such statement was not hearsay under Oklahoma law and was admissible as evidence against Petitioner, because it was made by Petitioner to Mr. Black, and Mr. Black testified about the statement at trial. *See* Okla. Stat. tit. 12, 2801(B)(2)(a) (Statements of a party offered against such party at trial are not considered hearsay and are admissible as evidence.). *See also*

20

*McElmurry v. State*, 60 P.3d 4, 19 (Okla. Crim. App. 2002) ("The prosecution is entitled to present statements or admissions made by a defendant, whether they are truthful, untruthful, or self-contradictory.").

Regarding Mr. Black's lost memory of what he told authorities during his interview, the prosecutor was responding to defense counsel's closing argument on the believability of Mr. Black's testimony. During closing argument, defense counsel argued that Mr. Black had denied making statements to authorities about what Petitioner told him during their conversation. (Tr. V, 890-91). The OCCA found it was not prejudicial error for the prosecutor to respond to defense counsel's argument about the credibility and content of Mr. Black's testimony and to specifically rely on evidence that Petitioner had stated he was going to beat someone. (Tr. II, 361, 363; Dkt. 7-3 at 3). *See United States v. Haar*, 931 F.3d 1368, 1377 (10th Cir. 1991) (finding no error where prosecutor's remarks were "invited" by defense counsel).

To the extent the prosecutor may have commented on Agent Dill's recollection of Mr. Black's statement about Petitioner's intent to rob someone, the OCCA determined that any error was harmless under the circumstances of the case. (Tr. V, 909; Dkt. 7-3 at 2). The jurors were properly instructed on the use of impeachment testimony (O.R. 387), and "[a] jury is presumed to follow its instructions," *Weeks v. Angelone,* 528 U.S. 225, 234 (2000). Furthermore, the evidence of Petitioner's intent to lure the victim to the location and rob him was cumulative to the testimony of other witnesses. Therefore, any error in referencing

Agent Dill's recollection of Mr. Black's statement had no adverse impact on the verdict, and no relief is warranted. *See Brecht v. Abrahamson*, 507 U.S. 619, 638-39 (1993) (holding trial error which had no substantial influence on the jury's verdict was harmless). *See also Neill v. Gibson*, 278 F.3d 1044, 1061 (10th Cir. 2001) ("[N]ot every improper or unfair remark made by a prosecutor will amount to a federal constitutional deprivation.") (citations omitted).

After careful review, the Court finds Petitioner has not met his burden of demonstrating the admission of impeachment evidence was so grossly prejudicial that it fatally infected the fairness of his trial, or that the OCCA's determination of this claim was contrary to, or an unreasonable application of, Supreme Court law. Therefore, Ground II of the petition fails.

**Ground III:  Ineffective Assistance of Counsel**

Petitioner next claims he was denied the effective assistance of trial counsel. Respondent alleges the OCCA's decision denying this claim was consistent with Supreme Court law.

Petitioner argued on direct appeal that instead of aggressively arguing the weaknesses in the State's case for first degree murder and urging the jury to return a verdict of either manslaughter or second degree murder, trial counsel essentially urged the jury to acquit Petitioner because of reasonable doubt as to first degree murder. While trial counsel's argument was factually supported, it was not reasonable to expect the jury to simply let

Petitioner go. Petitioner admitted there was ample evidence presented at trial that he was guilty of something, however, trial counsel did not adequate explain the conviction options to the jury, even though the jury was so instructed. Petitioner contended this was especially detrimental in light of the fact that the prosecution argued against any lesser-included offense.

Petitioner also argued on direct appeal that the prosecutor engaged in improper argument and misconduct when he urged the jury to consider the impeachment and bias evidence as substantive evidence of guilt. There, however, was no objection to this argument. Petitioner maintained that the prosecutor's arguments were so egregious that he was denied due process, but he claimed to have been equally prejudiced by trial counsel's inability to respond to the State's prejudicial tactics.

In denying the Petitioner's ineffectiveness of counsel claim, the OCCA concluded as follows:

> We reject Jacobs' claim of ineffective assistance of counsel because he has not shown that there is a reasonable probability that the outcome of his trial would have been different had trial counsel argued for instructions on lesser forms of homicide or objected to alleged prosecutorial misconduct. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); *Malone v. State*, 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206, *cert. denied*, __ U.S. __, 134 S. Ct. 172, __, __ L. Ed. 2d __ (2013); *Head v. State*, 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148.

*Jacobs*, slip op. at 3. (Dkt. 7-3).

"There is a strong presumption that counsel provided effective assistance of counsel, and petitioner has the burden of proof to overcome that presumption." *United States v.*

*Rantz*, 862 F.2d 808, 810 (10th Cir. 1988) (citing *United States v. Cronic*, 466 U.S. 648, 658 (1984)), *cert. denied*, 489 U.S. 1089 (1989). To prevail on his claim of ineffective assistance of counsel, Petitioner must show that (1) his counsel's performance fell below an objective standard of reasonableness, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.

On habeas review, the Court does not examine whether the elements of *Strickland* have been met. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Instead, the pivotal question is whether the state court's application of *Strickland* was reasonable. *Id*. When evaluating the state court's resolution of *Strickland's* performance requirement, federal courts must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189-90 (2011)).

As discussed above in Ground II, Petitioner was not denied a fair trial as a result of the prosecutor's comments. Any objection by his trial counsel on this issue would have been properly overruled or would have had no effect on the outcome of the trial. *See Sperry v. McKune*, 445 F.3d 1268, 1275 (10th Cir.) (finding that because an argument was meritless, counsel was not ineffective for failing to assert it), *cert. denied*, 549 U.S. 1039 (2006). *See also Allen v. Mullin*, 368 F.3d 1220, 1246 (10th Cir. 2004) (holding that if petitioner shows no prejudice as a result of claimed ineffectiveness of counsel, then the claim must fail), *cert.*

*denied*, 543 U.S. 1156 (2005).

As for Petitioner's claim that trial counsel was ineffective in failing to aggressively argue during closing for the jury to return a verdict of guilt on one of the lesser-included offenses, the record does not support the argument. Instead, the record shows that defense counsel vigorously argued throughout the trial that (1) Petitioner had no intent to kill the victim, (2) Petitioner was in the wrong place at the wrong time and got into a fight with the victim, (3) Petitioner defended himself, and (4) Petitioner panicked during the encounter. (Tr. II, 312-13, 318, 324-27, 331-34, 337-38, 390, 394; Tr. III, 485-86, 523; Tr. IV, 633, 748; Tr. V, 800).

Defense counsel also requested, and the trial court gave, jury instructions on the lesser-included offenses of first degree manslaughter and second degree murder. (O.R. 415-23; Tr. V, 831-46). During closing argument, he continued his theory that the Petitioner had panicked and made a mistake during a fight for his life. (Tr. V, 881-84, 889-95). While defense counsel did not specifically reference the lesser-included offenses during closing, it is apparent from the entirety of the argument that he was asking the jury to return a verdict of not guilty or, at the very least, acquit the defendant of first degree murder and return a verdict on a lesser offense. (Tr. V, 881-84, 889-95). *See Richter*, 562 U.S. at 106-07 (observing that defense counsel is permitted to make reasonable decisions and formulate a trial strategy based on the circumstances of the case).

While defense counsel's argument did not prove successful, success is not the measure

of an ineffectiveness claim. *See Richter*, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (quoting *Strickland*, 466 U.S. at 690). Given the evidence presented at trial, the Court finds Petitioner's claim that a different closing argument could have resulted in conviction of a lesser-included offense does not support a conclusion that trial counsel was ineffective. *See Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."); *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) ("[M]ere speculation is not sufficient" to satisfy a petitioner's burden on habeas corpus review).

The Court further finds the OCCA's decision on this claim was not contrary to, or an unreasonable application of *Strickland*, and the OCCA's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). This claim is denied.

## Ground IV: Cumulative Error

In his final claim, Petitioner alleges the accumulation of errors deprived him of a fair trial. The OCCA found no merit in this claim:

> There are no errors, considered individually or cumulatively, that merit relief in this case. *Jones v. State*, 2009 OK CR 1, ¶ 104, 201 P.3d 869, 894; *DeRosa v. State*, 2004 OK CR 19, ¶ 100, 89 P.3d 1124, 1157. This claim is denied.

*Jacobs*, slip op. at 4.

"Cumulative-error analysis applies where there are two or more actual errors. It does

26

not apply, however, to the cumulative effect of non-errors." *Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.) (citing *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990)), *cert. denied*, 522 U.S. 844 (1997). *See also Castro v. Ward*, 138 F.3d 810, 832-33 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998); *Le v. Mullin*, 311 F.3d 1002, 1023 (10th Cir. 2002), *cert. denied*, 540 U.S. 833 (2003) ("When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated.").

The Court finds there were no constitutional errors to aggregate in this action. Furthermore, Petitioner has failed to show that the OCCA's ruling on this claim was contrary to, or un unreasonable application of, Supreme Court law. This ground for relief also must be denied.

## Certificate of Appealability

The Court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, he has not "demonstrate[d] that reasonable jurists would find [this] court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability cannot be issued.

**ACCORDINGLY**, Petitioner's petition for a writ of habeas corpus (Dkt. 1) is DENIED, and Petitioner is DENIED a certificate of appealability.

**IT IS SO ORDERED** this 29th day of March 2018.

Ronald A. White
United States District Judge
Eastern District of Oklahoma